[Civ. No. 4540.   Second Appellate District, Division Two.—August 8, 1927.]

MINA W. WILLIAMS et al., Appellants, v. FIRST NATIONAL BANK OF SAN DIEGO (a Corporation) et al., Respondents.

788

L. E. Dadmun for Appellants.

Eugene Daney and Frederic W. Stearns for Respondents.

CRAIG, J.—The appellants C. L. Williams and Mina W. Williams are husband and wife. On and prior to January 29, 1917, one M. D. Goodbody was indebted to respondent The American National Bank of San Diego (hereafter for convenience called the American Bank), of which appellant C. L. Williams was vice-president and chief executive, in amounts aggregating $70,000, for which it held promissory notes signed by Goodbody, or by one Charles K. Voorhees, who had charge of Goodbody's financial affairs; the American Bank was not authorized to carry an obligation of any firm or individual in such a large amount, and Williams was required by the bank to curtail Goodbody's loans, whereupon Williams negotiated with the Security Commercial and Savings Bank of San Diego (hereafter called the Security Bank), to take up two of Goodbody's notes, amounting to $10,000, for which Williams received from the Security Bank, and delivered to the American Bank, a cashier's check, and Goodbody executed and delivered to the Security Bank his promissory note for $10,000; Williams and Voorhees executed and deposited with the

latter bank their notes for $10,000 and $3,000, respectively, as collateral security for Goodbody's paper; all three notes were dated January 29, 1917, and made payable six months from date. The Security Bank required further guarantees in the nature of real estate security, and Williams later deposited with his note a deed to certain real estate in San Diego County, but ultimately, and on September 28, 1918, all of the notes were canceled, and in their stead appellants executed two notes for $7,000 and $3,000, respectively, secured by a mortgage on real property of the appellant Mina W. Williams, and thereafter she was compelled to pay them both. During the month of December, 1917, the American Bank sold all of its assets to, and consolidated with the respondent First National Bank of San Diego, and appellant C. L. Williams' connection with the bank then terminated.

Appellant Mina W. Williams, joining her husband as a party plaintiff, instituted this action against both of the respondents, alleging in her complaint the Goodbody indebtedness, and the loan by the Security Bank above mentioned, and, further, that C. L. Williams' negotiations with the latter bank were conducted in his official capacity, and constituted acts of the American Bank; that appellants' obligations to the Security Bank were incurred as an accommodation to the American Bank; that the latter received the $10,000, and that since the plaintiff was compelled to pay such indebtedness with interest, the American Bank or its successor owed her $10,875, for which she prayed judgment, and each of the plaintiffs testified to all of the facts so alleged.

The respondents contended that Williams extended excessive credit to Goodbody on behalf of the American Bank, and that when reminded of that fact, he personally obtained credit for Goodbody at the Security Bank, without requesting or receiving authority to bind his own bank, in which transaction it had no interest and received no consideration.

The case was tried before the superior court and a jury. Appellants' witness Dorland, president of the Security Bank, testified that Williams personally applied for the loan of $10,000, and made no mention of the American Bank; that following the consolidation he returned and

said that he had severed his connection with the bank, and, further: "I don't want you to worry about this loan you have in here that is my personal obligation"; "So that you will feel entirely safe about it, I want to leave this deed with you to this piece of real estate which you will find is ample to cover it, and I expect soon to take up the note"; that Williams then stated that it was not a bank matter, and that thereafter, upon another occasion, he said: "Well, you need not be apprehensive about that matter you carry, because I will personally take care of it." Voorhees, called by the plaintiffs, swore that he had been requested by Williams to take charge of Goodbody's financial affairs, and that he always considered himself in the employ of the American Bank, although he received his salary from Goodbody; that the latter's loans from the bank through Williams ran up into the thousands," and that when Goodbody was unable to obtain further credit, he, Voorhees, or some other person, would sign notes upon which money or credit was then furnished to Goodbody; that the witness' financial condition was practically insolvent, and his notes were valueless, but that Williams willingly accepted them, doubtless knowing of his irresponsibility; that he received nothing for executing the notes, and did not intend that he would be called upon to pay them. There is evidence tending to support the foregoing statement of facts. An officer of the First National Bank, testifying for the plaintiffs, stated that Goodbody's loans were greatly in excess of the amount which a national bank was by law permitted to carry for one individual, that he demanded that Williams have them reduced, that the bank had no authority to allow its own credit to be used for such purpose, and did not in fact agree to do so. It appears that neither of the respondents indorsed, or took any part in obtaining credit upon, the notes which were executed to the Security Bank, unless it can be said as a matter of law that the acts of its vice-president even though ostensibly unofficial created an implied contract with appellants upon the part of the bank to save them harmless from any loss which they might incur in obtaining credit elsewhere for one of its patrons; Williams did not sign any of the documents mentioned in the name of the American Bank when obtaining or extending the $10,000 loan. Nearly two

years thereafter, and after Williams' service and official connection with the American Bank had been terminated, he and his wife executed new notes and a mortgage as security therefor, to the Security Bank, and it was insisted at the trial that Mrs. Williams was assured by her husband that the American Bank would guarantee that she should lose nothing through the transaction.

Thus it at once appears that there was present a case for the jury to decide upon conflicting evidence, unless, regardless of Williams' power to bind the bank, or thereafter to bind the consolidated banks, they or either of them could not legally authorize him to do so in this instance, and that a verdict for the plaintiffs could not be sustained upon any theory. At the close of the plaintiffs' evidence the defendants moved for an instructed verdict, and after extensive argument upon the law and the facts, the motion was granted, and the plaintiffs appealed.

Each of the parties directs our attention to section 5200 of the Revised Statutes of the United States (Stats. 1906; Barnes' Federal Code, sec. 9234), which limits the liability which any person, firm, or corporation may incur with a national banking association. That section prohibits any such liability in excess of ten per centum of the amount of the actually paid-up capital stock of a national bank which remains unimpaired, and ten per centum of its unimpaired surplus fund. The capital stock of the American Bank was $200,000, and its surplus was about $100,000. Hence, under the statutes, the utmost that this bank could legally have loaned to Goodbody, and the maximum liability which he could have been permitted to incur, was about $30,000, whereas, he borrowed upon promissory notes of his own and of others, some of which were worthless, amounts aggregating $40,000 more than the federal statutes allowed.

But we are not here concerned with the question as to whether or not the American Bank, or Williams, violated the law in extending excessive credit, and it is not necessary to afford it more than passing attention for whatever evidentiary value it may have, coupled with the other facts presented, as an indication of Williams' knowledge and intent when negotiating with the Security Bank. Unless the plaintiffs were entitled to a verdict of the jury, this proposition may be eliminated.

■ We are convinced by an abundance of authority that neither of the respondent banks could have guaranteed Goodbody's notes, nor have legally bound itself to secure Mina W. Williams against loss in the transaction here involved. In *Bowen* v. *Needles National Bank,* 94 Fed. 925 [36 C. C. A. 553], which was an appeal from the southern district of California, facts strikingly similar to those of the instant case were presented. The only difference of consequence is that there the defendant bank did in fact guarantee in writing that the obligations would be met at maturity. It was an attempt to finance the business of another, on paper, and without finances. The circuit court of appeals for the ninth circuit, affirming a judgment for the defendants, said, in part:

"It may be stated in general that no banking corporation has the power to become a guarantor of the obligations of another, or to lend its credit to any person ór corporation, unless its charter or governing statute expressly permits it. *Farmers & Mechanics' Bank* v. *Butchers & Drovers' Bank,* 16 N. Y. 125 [69 Am. Dec. 678]; *Morford* v. *Bank,* 26 Barb. (N. Y.) 568; Thompson on Corporations, sec. 5721. Under section 5136 of the Revised Statutes, national banking associations are given the power to 'make contracts' and 'to exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this title.' There is in these provisions no grant of power to guarantee the debt of another, nor can such guaranty be said to be incidental to the business of banking. It has been so held in *Seligman* v. *Bank,* 3 Hughes, 647, Fed. Cas. No. 12,642, *Norton* v. *Bank,* 61 N. H. 589 [60 Am. Rep. 334], and *Bank* v. *Pirie,* 82 Fed. 799 [27 C. C. A. 171]. An apparent exception is recognized in the case of the discount of promissory notes by national banks which may be transferred with a guaranty, but it rests upon the ground that the guaranty of such paper is but an ordinary incident

to its transfer in the course of banking. In *People's Bank*
v. *National Bank*, 101 U. S. 181 [25 L. Ed. 907], the court
said: 'To hand over with an indorsement and guaranty is
one of the commonest modes of transferring the securities
named.' There can be no doubt that the guaranty in the
present case was *ultra vires*. It was aside and apart from
the business of banking. The case is not that of an officer
of a bank exceeding the powers delegated to him, but it is
a case where the banking association itself has exercised
powers in excess of those which were conferred upon it by
statute. The plaintiff, equally with the defendant bank, was
bound to take notice of the statute.'' There are many other
authorities which hold that an attempted guaranty by a
national bank of the fulfillment of another's obligation in
which the bank has no interest is *ultra vires,* and void.
*Thilmany* v. *Iowa Paper Bag Co.,* 108 Iowa, 333 [79 N. W.
68]; *Farmers' etc. Bank* v. *Smith,* 77 Fed. 129 [23 C. C. A.
80]; *Barron* v. *McKinnon,* 179 Fed. 759; *Merchants' Bank* v.
*Baird,* 160 Fed. 642 [17. L. R. A. (N. S.) 526, 90 C. C. A.
338]; *Flannigan* v. *California National Bank,* 56 Fed. 959
[23 L. R. A. 836].) In the case at bar it is not contended
that the American Bank transferred Goodbody's notes to
the Security Bank, or that it indorsed them, or discounted
them. Williams merely obtained elsewhere the sum of
$10,000 and refunded to the American Bank a portion of
the moneys which it had loaned. Goodbody executed and
delivered to the Security Bank a promissory note for $10,000,
for which apparently a friend gave additional security, and
it became a distinct transaction which the American Bank
was prohibited from underwriting or guaranteeing.

█ It is obvious, therefore, that in the most favorable
light which can be cast upon appellants' theory of the case,
had the American Bank given to Williams express written
authority to negotiate a loan, and agreed to protect him or
any guarantor whom he might select against loss, which it
is not contended here to have done, such authority or guar-
anty would have been *ultra vires,* and void. If the bank
could not delegate authority to do that which it in fact
was itself precluded from doing, the inevitable result is that
such authority cannot be implied from the mere fact that
Williams was vice-president and chief executive officer of the

794

bank. ▮ It is argued that the American Bank had at other times so guaranteed commercial paper, and had negotiated, accepted, and paid such obligations through appellant Williams. This fact does not, however, alter the legal status of the present case. Appellants were therefore not entitled to demand reimbursement from either of the respondents, and a judgment in their favor would have been without legal foundation. The motion for a directed verdict against the plaintiffs was therefore properly granted.

▮ Appellants also pleaded by a common count an alleged cause of action for moneys had and received by the respondents. As we have seen, the amount received by respondents was in satisfaction of a debt due them from Goodbody, and was obtained upon the promissory note of Goodbody, which he executed and delivered to the Security Bank. No money was received by either of the respondents from Mina W. Williams, or from C. L. Williams, and this count was therefore not supported by the evidence.

▮ The appellant Mina W. Williams merely joined her coplaintiff in the title of her complaint, and the prayer demanded judgment for her alone. Following the conclusion of the plaintiffs' evidence, and during argument, their counsel asked leave to amend the prayer of their complaint, and to include the name of C. L. Williams therein, which the trial court announced was granted. After the close of argument by the respective parties, the court declined to permit such amendment, and instructed the jury to return a verdict for the defendants. This is assigned as a ground for reversal. The trial court had full power and control over its orders and rulings during the trial, and reversed itself only after extensive argument of the facts and the law, which are embraced in the record before us. It may well have appeared that the requested amendment, including both plaintiffs in the complaint, when neither was entitled to judgment, would be futile and would avail them nothing. Had the motion been granted, the addition of a prayer for judgment in favor of C. L. Williams would afford him no added relief, except that he also might join in an appeal. Since we are impelled to hold in favor of the respondents, an affirmance of the judgment leads to the patent conclusion that appellants were not prejudiced by the subsequent ruling.

Appellants cite many authorities holding that where the plaintiffs make out a case they are entitled to have it passed upon by the jury, and that in making loans, discounting notes, or other legitimate banking business within the scope of the federal statutes permitting such transactions, the institution will be presumed to have knowledge of, and acquiesce in, and will be bound by, the acts of its officers. However, such a case is not here presented, and appellants cite no authority in conflict with those which do control in the instant case, and which have been cited as a basis for this decision.

The judgment is affirmed.

Works, P. J., and Thompson, J., concurred.